**KULTUR INTERNATIONAL FILMS LTD., etc., Plaintiff,**

v.

**COVENT GARDEN PIONEER, FSP., LTD., etc., Defendant.**

Civ. A. No. 93–4811.

United States District Court, D. New Jersey.

Aug. 23, 1994.

Howard J. Schwartz, Cynthia D. Richardson, Porzio, Bromberg & Newman, Morristown, NJ, for plaintiff.

H. Curtis Meanor, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, NJ, and Michael C. Silberberg, Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, for defendant.

## *OPINION*

WOLIN, District Judge.

On September 24, 1993, plaintiff Kultur International Films, Ltd. ("Kultur"), a New Jersey corporation, with its principal place of business also in New Jersey, brought this action against defendant Covent Garden Pioneer FSP, Ltd. ("CGP"), a British corporation with its sole office located in London, England. Kultur originally filed its complaint in New Jersey Superior Court. CGP subsequently removed the action to this Court on October 29, 1993, pursuant to 28 U.S.C. §§ 1441 and 1446, and in conformity with the requirements for diversity jurisdiction set forth in 28 U.S.C. § 1332. Kultur pursues various contract and tort claims against CGP in connection with an alleged agreement between the parties whereby Kultur was to become the exclusive North American home video distributor for assorted classical music and opera programs owned by CGP.

On the pending motion, Kultur asks the Court to dismiss Kultur's complaint for lack

of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Alternatively, CGP requests that the action be dismissed on the ground of forum non conveniens.

## DISCUSSION

### A. Personal Jurisdiction

#### 1. Standard of Review

■ Rule 4(f) of the Federal Rules of Civil Procedure allows the Court to exercise personal jurisdiction over a nonresident defendant to the extent allowed by the long-arm statute of the state where the court sits.[1] New Jersey's long-arm statute, N.J.Ct.R. 4:4–4, permits the exercise of personal jurisdiction over a nonresident defendant to the outer boundaries allowed under the Due Process Clause of the Fourteenth Amendment of the Constitution. *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 284 (3d Cir.), *cert. denied*, 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981); *Doumani v. Casino Control Comm'n*, 614 F.Supp. 1465, 1471 (D.N.J.1985).

■ The purpose of restricting personal jurisdiction to the limits of due process is to protect the individual interests of nonresident defendants. *United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). A court may exercise personal jurisdiction over a nonresident defendant only where "minimum contacts" exist such that jurisdiction "does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). A defendant establishes minimum contacts with a forum state by committing some act by which he purposefully avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of

its laws. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

■ These contacts must be of the nature such that the individual nonresident defendant "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) (citing *World–Wide Volkswagen*, 444 U.S. at 295, 100 S.Ct. at 566). What constitutes minimum contacts varies with the "quality and nature of the defendant's activity," *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1240, but the unilateral activity of a plaintiff claiming a relationship with a nonresident defendant does not suffice to create the requisite forum contacts. *Id.*; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984); *Kulko v. Superior Court of California*, 436 U.S. 84, 93–94, 98 S.Ct. 1690, 1698, 56 L.Ed.2d 132 (1978).

Defendants can be subject to specific or general personal jurisdiction in a forum state. If a plaintiff's cause of action against a defendant does not arise out of the defendant's contacts with the forum state, the plaintiff must establish that defendant has sustained "continuous and substantial contacts" with the forum state such as to create general jurisdiction over the defendant. *Helicopteros*, 466 U.S. at 416, 104 S.Ct. at 1873. Sporadic contacts between the nonresident defendant and the forum state may suffice if the plaintiff's cause of action arises out of, or relates to the defendant's contacts with the forum state. *Id.* at 414, 104 S.Ct. at 1872.

■ To establish specific jurisdiction, there is sufficient due process contact for personal jurisdiction if the defendant purposefully has directed his activities at residents of the forum. *Henry Heide, Inc. v. WRH Prods. Co.*, 766 F.2d 105, 108 (3d Cir. 1985). Here the focus is on whether the defendant conducted activities in the forum such that the defendant might "reasonably anticipate being haled into court there."

---

**1.** The substance of former Rule 4(f) is currently contained in Rule 4(k), which became effective December 1, 1993. Service of process in the instant case occurred prior to this effective date.

Therefore, to the extent federal procedural rules apply, to service here, the Court looks to the rules in affect prior to the 1993 amendment.

*World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567.

■ Invoking constitutional principles of due process, CGP asserts that it is not subject to the jurisdiction of this Court. Once a defendant properly disputes the existence of personal jurisdiction, the plaintiff bears the burden· of establishing, by a preponderance of the evidence, sufficient facts demonstrating the court's jurisdiction. *Carteret Sav. Bank, FA v. Shushan,* 954 F.2d 141, 146 (3d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992). To this end, the plaintiff must present a prima facie case for the exercise of personal jurisdiction by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Mellon Bank (East) PSFS Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992) (citing *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir.1987)).

"[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction. Once the motion is made, plaintiff must respond with actual proofs, not mere allegations." *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 67 n. 9 (3d Cir.1984). *See also Carteret Sav. Bank,* 954 F.2d at 146; *Farino,* 960 F.2d at 1223.

If the plaintiff establishes a prima facie case supporting personal jurisdiction, the defendant then "bear[s] the burden of showing the unreasonableness of an otherwise constitutional assertion of jurisdiction...." *Farino,* 960 F.2d at 1223. Given the parties' respective burdens, the Court has reviewed the permitted submissions and, having resolved all disputes in favor of Kultur, makes the following findings of fact.

## 2. Facts

Kultur, a New Jersey corporation, is well known in the entertainment industry and is one of the largest distributors of classical music and opera videotapes in the United States. (Certification of Dennis Hedlund Affidavit ¶ 1) CGP is a British corporation which, at a minimum, appears to own the rights to produce, sell and distribute video programs of various ballets and operas. CGP does none of the following in the State of New Jersey: (1) pay taxes, (2) maintain an office, mailing address, telephone number or bank accounts, (3) solicit or operate any business via agents, representatives or employees, (4) own real or personal property. (Affidavit of Robert Albert ("Albert Affidavit") ¶¶ 2–10)

The genesis of this litigation dates back to December 1992, when Dennis Hedlund, president of Kultur, met with Revel Guest of Transatlantic Films in New York. (Hedlund Certification ¶ 2) During the course of this business meeting Guest, who also is the Executive Producer at CGP, suggested that Hedlund call Christopher Higham, CGP's Sales and Marketing Director, to discuss a potential distribution project in North America for the videotapes of various ballet and opera productions from the Royal Opera House. (*Id.* at ¶ 3)

Hedlund subsequently contacted Higham in early 1993 and the parties set about negotiating an agreement for the North American distribution of various CGP videos by Kultur. The negotiations were somewhat fruitful, but led only to the exchange of various proposed Heads of Agreement (dated March 25, March 31 and April 15, 1993), and a proposed License Agreement, drafted by Kultur and dated June 16, 1993. (Hedlund Certification, Exhibits F, K; CGP's Brief in Support of Motion to Dismiss, Exhibits 2–4) Neither of the parties executed any of these proposed agreements. Whether or not there existed some type of oral agreement between the parties is hotly disputed and rests at the heart of this litigation.

On the pending jurisdictional motion, however, the Court will refrain from inquiring into the merits of Kultur's claims. *See Associated Business Telephone Sys. v. Danihels,* 829 F.Supp. 707, 711 (D.N.J.1993) (assuming existence of disputed contract on jurisdictional motion). Rather, the Court turns to those facts relevant to determining whether this Court may properly exercise personal jurisdiction over CGP by virtue of CGP's contacts with New Jersey.

As indicated above, the initial meeting between Guest and Hedlund occurred in New York. During the course of the subsequent negotiations, CGP sent faxes, letters and materials and placed calls to Kultur at its West Long Branch, New Jersey office. Kultur has provided evidence of certain of these communications:

1. a February 5, 1993, fax from Higham indicating CGP's desire to do business with Kultur;

2. a February 11, 1993, fax from Higham which confirms ongoing negotiations and Hedlund's planned visit to England in March 1993;

3. a February 15, 1993, fax from Higham regarding Hedlund's visit;

4. a February 18, 1993, fax from Higham regarding Kultur's viewing of four video cassettes;

5. on February 22, 1993, CGP delivered to Kultur four video cassettes for Kultur to preview;

6. a February 24, 1993, fax from Higham concerning a screening scheduled for Hedlund's March visit to England; and

7. an April 15, 1993, fax from Nicola Cobbold, CGP Business Affairs manager, covering a proposed Heads of Agreement of the same date.

(Hedlund Certification ¶ 7, Exhibits A–F)

In addition, Hedlund attests to numerous other telephone calls made by CGP to Kultur during the course of the negotiations, dates of which he cannot specifically recall. (*Id.* at ¶ 8)

On May 27, 1993, Higham phoned Hedlund to advise him that CGP's board of directors had approved the licensing and appointment of Kultur as its exclusive North American distributer. (*Id.* at ¶ 6h) One day later, Higham called to request additional financial information from Kultur. (*Id.* at 10) On June 5, 1993, Hedlund and Higham met in New York to discuss marketing plans and strategy. (*Id.* at 12) On June 17, 1993, Hedlund sent to CGP the proposed License Agreement. (*Id.* at ¶ 15) As noted, neither party ever executed a written contract.

Subsequently, CGP endured a management upheaval, after which it executed an exclusive licensing and distribution agreement for North America with Public Media, Inc. ("PMI"). (Reply Declaration of Robert Alpert ("Alpert Reply Declaration") ¶¶ 3, 5) Under the terms of the agreement, PMI and its subsidiary Home Vision/Video Opera House produce, sell and distribute CGP programs via master cassettes from the CGP library. (*Id.* at ¶¶ 8–9)

On June 23, 1993, Cobbold sent a fax to Kultur, denying the existence of any agreement with Kultur and implying that CGP's May 28, 1993, request for additional information had ultimately led to the selection of another distributor. (Hedlund Certification, Exhibit L) In subsequent communications from Cobbold on June 25 and July 16, 1993, CGP continued to deny the existence of a contract and indicated that CGP would not consider itself bound by any representations made to Kultur by Higham, who was no longer employed by the company as of July 6, 1993. (*Id.*, Exhibits M–N)

In its complaint, Kultur alleges that CGP breached the alleged contract and its duties of good faith and fair dealing and of good faith bargaining, and made intentional or negligent misrepresentations to Kultur concerning the alleged agreement. At a minimum, Kultur seeks restitution for the 130,000 full-color catalogs it prepared in reliance on Higham's representation that CGP had ratified the licensing and distribution agreement with Kultur. (Complaint; Hedlund Certification ¶ 13)

### 3. Minimum Contacts

#### a. General Personal Jurisdiction

To succeed on a claim of general jurisdiction, Kultur must establish that CGP has had continuous and systematic contacts with New Jersey so that to subject it to the Court's general jurisdiction will not violate the Fourteenth Amendment guarantee of due process. In fact, Kultur asserts that CGP's contact with New Jersey has been "continuous and systematic." (Kultur's Brief in Opposition at 22–24) To support this argument, Kultur points to CGP's licensing and distribution agreement with PMI. This arrangement enables CGP to sell its video programs by mail

order and through retail stores located in New Jersey, which constitutes one of the largest markets in North America for CGP's product. (Hedlund Certification ¶ 22)

Kultur attempts to establish general jurisdiction under the stream-of-commerce theory: CGP, via its distributor, is doing business in New Jersey on a continuous and systematic basis, for the purpose of reaping a pecuniary profit and with the expectation that its product will be purchased by New Jersey consumers. As shown by Kultur, a New Jersey consumer may walk into a nearby video retail store and purchase a copy of a video program owned by CGP and distributed by PMI, or may order similar CGP products over the telephone by calling Home Vision/Video Opera House. (Certification of Jason J. Laubenstein ¶ 2; Certification of Barbara Desjadon–Sell ¶¶ 2–4)

The jurisdictional stream-of-commerce theory initially developed exclusively to redress physical injury in products liability tort actions. *See DeJames*, 654 F.2d at 283. *See also World–Wide Volkswagen*, 444 U.S. at 297–298, 100 S.Ct. at 567 (due process requires that the manufacturer deliver products into stream of commerce such that it could foresee that they would be consumed in forum state).

The United States Supreme Court subsequently addressed the stream-of-commerce theory in *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Justice O'Connor's plurality opinion, which is considered persuasive authority in this circuit, *see Narco Avionics, Inc. v. Sportsman's Market, Inc.*, 792 F.Supp. 398, 405 (E.D.Pa.1992), refined the analysis and placed a premium not only on foreseeability but on the purposeful direction of activity toward the forum state:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposely directed toward the forum State.... [A]wareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing

the product into the stream into an act purposely directed toward the forum State. 480 U.S. at 112, 107 S.Ct. at 1032.

■ To determine whether a business purposefully directed a product toward the forum state, a court may consider the following factors: whether the business (1) designed the product for the forum state market, (2) directed advertising at the forum state, (3) established channels for providing regular advice to forum state customers, or (4) marketed a product through a distributor who agrees to serve as a sales agent in the forum state. *Id.* Purposeful participation in a product distribution chain does not "itself yield jurisdiction in the absence of some indicia of purposeful affiliation with the forum state." *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 300 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985).

Kultur confronts a formidable task by employing a stream-of-commerce theory to establish general jurisdiction, particularly under the circumstances of this case. The theory is generally employed to establish specific jurisdiction—where plaintiff's cause of action arises directly from the product placed by defendant into the stream of commerce. *See, e.g., Max Daetwyler Corp.*, 762 F.2d at 293.

■ In the instant case, CGP's video programs that currently sell in North America, and the licensing and distribution agreement with PMI, have no direct relationship to the claims asserted by Kultur. Therefore, Kultur could not advance an argument for specific jurisdiction based upon the stream-of-commerce theory. Moreover, the record presented does not support Kultur's argument that the distribution agreement with PMI and the retail sales of CGP's video programs in New Jersey are sufficient to establish general jurisdiction over CGP.

■ Under the terms of its agreement with PMI, CGP has transferred to PMI the responsibility for product distribution. Sales of all CGP programs under the PMI agreement are controlled by PMI, an Illinois corporation. PMI makes the unilateral decision to bring the CGP product into New Jersey. The terms of the agreement expressly pro-

vide for a distribution area that covers the entire United States, its territories and possessions and Canada. The fact that CGP products are purchasable at retail stores in New Jersey and are available by mail order from Home Vision/Video Opera House in Massachusetts is not enough to support jurisdiction.

Kultur has presented no evidence that CGP—or PMI for that matter—has directly solicited business in New Jersey, advertised in New Jersey, provided services to New Jersey purchasers of its product, designed its product with New Jersey customers in mind, or specifically directed a distributor to promote and sell its product in New Jersey. Kultur relies only on the PMI licensing and distribution agreement and the sale of CGP video programs in New Jersey. Neither of these facts indicate that CGP purposefully directed its activities toward New Jersey and thus could foresee defending its actions in a New Jersey court.

In cases involving distribution arrangements like the one between CGP and PMI, it is difficult enough to establish that the exercise of specific jurisdiction would be proper under a stream-of-commerce theory. *See, e.g., Max Daetwyler*, 762 F.2d at 299–300; *Narco Avionics*, 792 F.Supp. at 403–407. In the instant case, Kultur attempts to utilize that theory—unsuccessfully—to establish that CGP's contacts with New Jersey have been continuous and systematic. The record presented cannot support Kultur's stream-of-commerce theory and provides wholly inadequate grounds to support the exercise of general jurisdiction over CGP.

### b. Specific Jurisdiction

A court may exercise specific jurisdiction over a nonresident defendant only by finding "some act by which the defendant 'purposefully availed itself' of the privilege of conducting activities within the forum." *Mellon Bank (East) PSFS, N.A. v. DiVeronica Bros.*, 983 F.2d 551, 554 (3d Cir.1993) (quoting *Denckla*, 357 U.S. at 253, 78 S.Ct. at 1239. *Farino*, 960 F.2d at 1221 (specific jurisdiction exists when plaintiff's claims arise from or relate to defendant's forum contacts). Kultur argues that CGP is subject to the Court's specific jurisdiction, because

Kultur's contract and tort claims arose out of CGP's contacts with New Jersey.

As noted, although it is not clear that the alleged contract exists, the Court has assumed the existence of a contract for purposes of this motion. However, there is little evidence before the Court regarding the terms of this contract. The Court is constrained to look only to the averments of Hedlund and the terms of the proposed Heads of Agreement and License Agreement, as these are the only evidence provided to the Court that indicates that there may have been an agreement between the parties.

Contract claims predominate Kultur's complaint. Although the place of contracting may be significant in the contacts equation, parties reaching out beyond one state to contract with parties from another state may be subjected to the regulations and sanctions of that other state. *Burger King*, 471 U.S. at 473, 105 S.Ct. at 2182. However, a court may not exercise jurisdiction over a nonresident merely because the nonresident has contracted with a resident of the forum state. *Farino*, 960 F.2d at 1223. Due process requires more contacts by the nonresident defendant with the forum state, which "may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties." *Id.*

■ In view of these legal principles, nowhere does Kultur allege, much less proffer fact, that CGP—or its alleged agent Higham—was ever physically present in New Jersey in connection with the alleged contract. This fact clearly distinguishes the instant case from certain of the cases cited by Kultur, in which the nonresident defendant was alleged to have visited the forum state on at least one occasion. *See En Vogue v. UK Optical Ltd.*, 843 F.Supp. 838, 840–41 (E.D.N.Y.1994); *Hoster v. Monongahela Steel Corp.*, 492 F.Supp. 1249, 1251 (W.D.Okla.1980).

CGP had no physical presence in New Jersey in connection with the events giving rise to this action. The first discussions between Kultur and CGP—the meeting between Guest and Hedlund—occurred in New

York. After negotiations were underway, the next face to face meeting between the parties presumably occurred when Hedlund visited London in March 1993.

Consequently, and notwithstanding the arguments regarding stream-of-commerce and contract performance, Kultur hangs its jurisdictional hat on the contacts listed above. *See supra* pp. 8–10. The Court must determine whether these particular contacts are sufficient to exercise specific jurisdiction over CGP with respect to both Kultur's contract and tort claims.

To this end, the Court is cognizant of the Supreme Court's observations in *Burger King:*

> Jurisdiction in [certain] circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction.

471 U.S. at 476, 105 S.Ct. at 2184.

The Court is satisfied that CGP had just enough contact with Kultur in New Jersey to allow this Court to exercise personal jurisdiction over CGP on the pending claims. Kultur has documented phone calls, telefaxes and letters sent to Kultur in connection with the negotiations and alleged agreement. Kultur's tort claim is grounded on representations made by CGP via Higham that emanated from London, but were directed to and received by Kultur in New Jersey. *See Lebel v. Everglades Marina, Inc.,* 115 N.J. 317, 327–28, 558 A.2d 1252 (1989) (in contract and tortious misrepresentation action, concluding that Florida seller's "alleged phone calls to New Jersey and use of mails to solicit contract [from New Jersey purchaser] would satisfy the minimum-contacts requirement" although neither defendant nor the purchased good were ever physically in New Jersey).

Kultur also argues that both the performance and the subject matter of the alleged contract were contemplated as being in New Jersey. Kultur resides and does business in New Jersey, and the alleged agreement calls for a distribution territory throughout North America. (Hedlund Certification ¶¶ 1, 5 and Exhibits F, K) Therefore, CGP allegedly knew that the agreement with Kultur would impact upon New Jersey via Kultur's performance and the distribution of product in the attractive New Jersey market. Based on the alleged contract and misrepresentations, Kultur produced, in-house in New Jersey, 130,-000 full-color catalogs which referenced the availability of CGP programs through Kultur.

The record does not reveal that CGP considered a deal with Kultur specifically for the purposes of selling its product in New Jersey. The territory under the alleged contract was to be all of North America. (Complaint ¶¶ 4, 5) Nonetheless, the Court is satisfied that CGP could have reasonably foreseen that its contacts with Kultur would have had some type of impact on Kultur and New Jersey, notwithstanding the fact that the terms of the alleged agreement presumably called for nationwide distribution of CGP product. *See Covenant Bank for Sav. v. Cohen,* 806 F.Supp. 52, 56 (D.N.J.1992) (defendant's action must be expressly aimed at the forum state and not just at the plaintiff); *Narco Avionics,* 792 F.Supp. at 408 (jurisdictional question does not "turn on mere foreseeability of injury to a citizen of the forum, but rather on the fact that injury was caused by activity intentionally directed by defendants at the plaintiff and his forum") (citing *Calder v. Jones,* 465 U.S. 783, 789–80, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984)).

The instant case is not analogous to those cases in which (1) the defendant's activity occurs in a number of states (nationwide publication of a libelous statement or trademark infringement of a national product), (2) the defendant *did not* specifically direct the

action-instigating activity toward the forum state, (3) the defendant has no other contacts with forum state, and (4) the plaintiff suffered injury in forum state.

Whether Kultur's reliance on Higham's representations was justified, or whether there was ever an existing contract, goes to the merits of Kultur's claims and not to the pending jurisdictional question. The record indicates that CGP, through its agent, Higham, engaged in a course of negotiations with Kultur, resulting in numerous CGP contacts with New Jersey via mail and telecommunications. These contacts provide the factual underpinnings to Kultur's contract and tort claims and did not arise out of the unilateral activity of Kultur.

In view on these contacts, the Court finds that CGP purposefully directed its activity toward Kultur and the State of New Jersey. Therefore, CGP could have reasonably foreseen that it might be called into this Court as a defendant on Kultur's pending claims which arise directly out of CGP's specific contacts with Kultur and New Jersey.

### 4. Fair Play and Substantial Justice

Having established that CGP has minimum contacts with New Jersey sufficient to allow this Court to exercise specific jurisdiction over CGP, Kultur must also show that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. To this end, the Court must consider the burden on CGP to litigate here, the interests of New Jersey in this litigation, and Kultur's interest in obtaining relief. *Lebel,* 115 N.J. at 329, 558 A.2d 1252.

Notwithstanding CGP's arguments to the contrary, the Court finds that the exercise of jurisdiction is not offensive. In seeking dismissal of this action, CGP cannot now rely exclusively on the burden of litigating in New Jersey. It risked potential litigation in New Jersey when it actively negotiated and allegedly agreed to a distribution deal with Kultur. New Jersey has an interest in providing a forum in which its resident corporations may seek to vindicate their rights. Kultur obviously has an interest in pursuing its claims in the United States, although an English court may also provide the requested

relief. *See infra* pp. 21–25. Given these considerations, and CGP's contacts with New Jersey, the Court will deny CGP's motion to dismiss for lack of personal jurisdiction.

### B. Forum Non Conveniens

CGP has moved, in the alternative, to dismiss Kultur's complaint under the doctrine of forum non conveniens. This doctrine allows for dismissal, in the court's discretion, "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would 'establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981) (quoting *Koster v. Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 831–32, 91 L.Ed. 1067 (1947)).

■ To grant CGP's motion the Court must determine (1) whether an adequate alternative forum exists for the adjudication of Kultur's claims, and, (2) based upon the existence of such an alternative forum, whether certain interests of both the public and the parties favor dismissal of Kultur's complaint. CGP "bears the burden of persuasion as to all the elements of the forum non conveniens analysis." *Lacey v. Cessna Aircraft Co. ("Lacey I"),* 862 F.2d 38, 43–44 (3d Cir.1988).

### 1. Adequate Alternative Forum

■ On a forum non conveniens motion, the Court, as a threshold matter, must determine whether an adequate alternative forum exists. *Lacey I,* 862 F.2d at 44. Two conditions must be satisfied to meet this adequacy requirement: (1) the defendant must be amenable to process in the alternative forum, and (2) the subject matter of the lawsuit must be cognizable in the alternative forum in order to provide the plaintiff appropriate redress. *Piper,* 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22; *see also Lacey v. Cessna Aircraft Co. ("Lacey II"),* 932 F.2d 170, 180 (3d Cir.1991).

In the instant case, CGP contends that England represents an adequate alternative forum for this action. To support its argument, CGP proffers the affidavit of Joseph Smouha, a member of the English bar since 1986, who specializes in international commercial litigation. (Affidavit of Joseph Smouha ¶1) By virtue of its incorporation and residency in England, CGP would be amenable to the jurisdiction of an English court. (*Id.* at ¶5) The Court finds that CGP has satisfied the first prong of the threshold inquiry into the adequacy of the alternative forum.

On the second prong—the availability of appropriate relief in the alternative forum—CGP has assessed each and every claim contained within Kultur's complaint and argues that an English court, applying English law, would provide redress at every turn. In considering the treatment of Kultur's claims by an English court, this Court is mindful that unless the law applied by the English court would be "so inadequate or unsatisfactory that it is no remedy at all," the possibility that Kultur may receive less favorable results is not a factor to be considered. *Piper*, 454 U.S. at 254, 102 S.Ct. at 265.[2]

Kultur's six-count complaint contains the following causes of action: (1) breach of contract, (2) intentional or negligent misrepresentation, (3) breach of the duty of good faith and fair dealing, (4) breach of the duty of good faith bargaining, (5) restitution, and (6) declaratory judgment. Smouha's detailed assessment of Kultur's claims under English law indicates that these claims would receive more than adequate treatment in an English court, under English law.

On Kultur's breach of contract claim, English law provides mechanisms for determining consideration, assent and contract formation, and is equipped to handle the relevant questions of agency, authority, implied terms and oral agreements. (Smouha Affidavit ¶¶8-11) English law also provides for expectation or reliance damages and the recovery of costs and legal fees if the plaintiff's claim proves successful. (*Id.* at ¶12)

On the claim of misrepresentation, English law would allow Kultur, as the victim of such misrepresentations—whether intentional or negligent—to avoid the alleged contract and recover reliance damages. (*Id.* at 14) In addition, negligent misrepresentation gives rise to a cause of action under English statutory law and entitles the successful plaintiff to compensatory damages. (*Id.* at 15) Finally, English law also recognizes, and provides compensatory damages for, the tort of fraudulent misrepresentation in circumstances where the defendant knowingly or recklessly makes a false representation. (*Id.* at 16)

On Kultur's restitution claim, CGP identifies the following principles of English law that might govern the treatment of this type of claim. First, English law recognizes estoppel principles, grounded in equity, that may be applicable to situations where negotiations do not lead to the formation of a contract. Second, English law also recognizes the concept of ex post ratification wherein a party, by virtue of its conduct, may subsequently ratify the unauthorized acts of an agent. Third, as mentioned previously, English law provides for reliance damages as an alternative to expectation damages where a contract is set aside for misrepresentation and where a party receives none of the bargained-for consideration. (Smouha Affidavit ¶¶20-22)

As to Kultur's request for a declaratory judgment under New Jersey law, English law gives the courts discretion to make binding declarations of right regardless of whether any consequential relief is or could be requested. (*Id.* at 23)

---

2. The Court will not attempt to discern what law an English court would apply to Kultur's claims. *Lacey II*, 932 F.2d at 187 n. 14 (on forum non conveniens motions, courts need not engage in complex choice of law analysis). Even if the Court were to deny CGP's motion to dismiss, there is no guarantee that New Jersey law would govern Kultur's common law claims. *See infra* pp. ———. Nonetheless, assuming that New Jersey would provide the applicable law should the case proceed here, the Court will address the adequacy of an English forum on the assumption that an English court would apply English law to Kultur's claims. *See* Smouha Affidavit ¶6 (stating that an English court would apply English law to the issues of validity and interpretation of the alleged contract).

On Kultur's claim for breach of good faith and fair bargaining, CGP acknowledges that English law does not provide a comparable cause of action, but reiterates that the equitable principles of estoppel may apply in situations where a party, during the course of commercial negotiations, breaches the recognized duty to refrain from engaging in negligent, reckless or knowing misrepresentation. (*Id.* at 18)

Based on CGP's proffer on the relevant English law, this Court is satisfied that the subject matter of Kultur's claims would be adequately recognized under English law and may be appropriately redressed in an English court. CGP has met its burden of establishing that England is an adequate alternative forum.

### 2. Public and Private Interests

Having determined that England represents an adequate alternative forum, the Court is now required to determine whether various public and private interest factors weigh in favor of retention or dismissal of the action. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); *Lacey II*, 932 F.2d at 180. These factors (the "*Gulf Oil* factors") fall into two groups: those relating to the convenience of the litigants and those affecting the public interest in the fair and efficient administration of justice.

Factors in the first group are: (1) plaintiffs' choice of forum; (2) the ease of access to sources of proof; (3) the availability and cost of compulsory process for unwilling witnesses; (4) any obstacles to a fair trial; and (5) in general, all other factors relating to the expeditious and efficient adjudication of the dispute.

Factors in the second group include: (1) the relative backlog and other administrative difficulties in the two jurisdictions; (2) the fairness of placing the burdens of jury duty on the citizens of the state with the greater interest in the dispute; (3) the local interest in adjudicating localized disputes; and (4) the appropriateness of having the jurisdiction whose law will govern adjudicate the dispute in order to avoid difficult problems in conflicts of laws. *Id.; see Sandvik, Inc. v. Con-*

*tinental Ins. Co.*, 724 F.Supp. 303, 307 (D.N.J.1989); *Hardaway Constructors, Inc. v. Conesco Indus.*, 583 F.Supp. 617, 619–20 (D.N.J.1983).

As a general rule, a court may not predicate dismissal on a singe *Gulf Oil* factor. *Lacey II*, 932 F.2d at 189. No one factor should be given conclusive weight. However, the factors should be balanced on a qualitative, rather than quantitative, basis. *Id.* at 182. Therefore, the factors should not be viewed as equal in weight, and, depending on the circumstances of each case, some factors may be " 'more' equal" than others. *Id.*

#### a. Private Factors

##### i. Kultur's Choice of Forum

In weighing the *Gulf Oil* factors, this Court must generally defer to the plaintiff's choice of forum unless the balance is tipped strongly in favor of dismissal. *See Gulf Oil*, 330 U.S. at 508, 67 S.Ct. at 843; *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 24 (3d Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971). Deference to the plaintiff's choice of forum is particularly required where the plaintiff resides in the forum state. *Piper*, 454 U.S. at 255–56, 102 S.Ct. at 265 (stating that "[w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient"). *See also Gulf Oil*, 330 U.S. at 507, 67 S.Ct. at 842 (stating that the doctrine of forum non conveniens is to guard against plaintiff's "temptation to resort to a strategy of forcing the trial at a most inconvenient place for an adversary, even at some inconvenience to himself").

Kultur has chosen a home forum in which to pursue its claims against CGP. Nonetheless, if required to assume the existence of a contract between the two parties, the Court finds that the record evidence reveals that the substance of that agreement may contain a forum selection term, which provides that the parties resolve all contract-related disputes in an English court. Each of the three proposed Heads of Agreement contains such a forum selection clause. (CGP's Brief in Support of Motion to Dismiss, Exhibits 2–4) The existence of a valid forum selection clause would vitiate any presumption that

New Jersey is a convenient forum for this litigation. *See In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir.1989) (stating that "deference to the filing forum would only encourage parties to violate their contractual obligations").

However, the proposed Heads of Agreement were drafted prior to the time CGP officials allegedly approved the deal with Kultur. The draft License Agreement, created subsequently by Kultur, did not contain any forum selection provision. Given the fact that Kultur has offered no written contract, or other significant proof regarding the terms of an alleged oral agreement, the Court cannot determine whether the draft License Agreement embodies the terms of the earlier oral agreement or reflects merely an ex post attempt by Kultur to alter the terms.

Therefore, the Court will factor the proposed forum selection clause into the *Gulf Oil* equation. The Court will presume that the New Jersey forum is convenient. However, given the evidence that Kultur may have agreed to litigate any of its contract-related disputes with CGP in England, the Court will not require that CGP establish that the other *Gulf Oil* private and public factors weigh heavily in favor of adjudication in an English forum. *See Lony v. E.I. DuPont de Nemours & Co.*, 886 F.2d 628, 635 (3d Cir.1989) (finding that where plaintiff resides in forum state, if the private factors are at equipoise, or are merely "tipped" in favor of the defendant, the district court should retain jurisdiction). The Court will accord no special weight to Kultur's choice of a New Jersey forum.[3]

### ii. Access to Proof and Witness Availability

In addressing these *Gulf Oil* factors, the Court must "scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of the evidence cited by the parties are critical, or even relevant" to Kultur's claims or CGP's potential defenses. *Van*

*Cauwenberghe v. Biard*, 486 U.S. 517, 528, 108 S.Ct. 1945, 1952, 100 L.Ed.2d 517 (1988).

Defendants raise the following points in support of dismissal. First, voluminous documentary evidence is located in England, and Kultur would be challenged to obtain this evidence in view of the international laws that would govern discovery if this Court retains jurisdiction. Second, CGP would be severely burdened by having to litigate this action in New Jersey. Third, and most significantly, Higham is the crucial witness in this case. CGP no longer employs Higham. The circumstances of his termination are currently the subject of a lawsuit in England. (Albert Affidavit ¶ 17). Higham is beyond the subpoena power of this Court. CGP argues that the inability to produce Higham as a witness before a jury in this case will prejudice CGP's defense.

The Court is convinced that the issues of document discovery and the convenience of party and non-party witnesses are at equipoise. Presumably, Kultur would assent to a more burdensome discovery process in exchange for a New Jersey forum. Potential witnesses most likely reside in both England and New Jersey. Finally, CGP cannot now be heard to complain about the burdens of litigating this action in New Jersey. CGP took the risk of defending a lawsuit in New Jersey when it reached out to a New Jersey resident to solicit and negotiate the alleged agreement.

The key private factor is the unavailability of Higham, the critical witness and a non-party in this case. He is beyond the subpoena power of this Court. *See* 28 U.S.C. § 1781. CGP asserts that Higham had no authority to enter into a contract with Kultur on CGP's behalf. (Albert Affidavit ¶¶ 15) Higham has sued CGP in England for wrongful termination of his consultancy. In defense, CGP has answered that Higham breached his agreement by, among other things, acting outside his authority. (Albert Affidavit ¶¶ 17) Given the state of affairs between CGP and Higham, CGP may no

---

**3.** If the Court were to determine that the parties had in fact agreed to this forum selection provision, and found it enforceable, Kultur's choice of a New Jersey forum would be given no weight at all. By agreeing to the forum selection term, Kultur would have effectively "chosen" to litigate its contract-related claims in England.

longer have the influence to persuade him to appear as a witness here.

Kultur has not attempted to guarantee Higham's willingness to testify at trial here. Although CGP has not definitively established that Higham would be unwilling to testify, the circumstances giving rise to Kultur's claims suggest that he might wish to avoid involvement in this litigation. The Third Circuit has acknowledged the burden that confronts litigating parties and a trial court when key non-party witnesses are not willing to testify and are beyond the reach of the court's compulsory process. *Lacey II,* 932 F.2d at 183.

Kultur argues that Higham's unavailability at trial should not be an obstacle to adjudication in New Jersey because the Federal Rules of Evidence would allow the introduction of his deposition testimony. Fed. R.Evid. 804(b)(1). Under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 28 U.S.C. § 1781, Kultur may compel Higham's attendance at a deposition, but must make prior application to the relevant governmental authorities. Kultur represents that American litigants have succeeded in requests to take depositions in England utilizing American procedures. In addition, requests to videotape depositions have also been granted. (Letter from Kultur's counsel, dated July 14, 1994) CGP disputes this representation and argues that it is very difficult to receive authorization under the Hague Convention to take a videotaped deposition under American rules of procedure. (Letter from CGP's counsel, dated July 21, 1994).[4]

Even assuming that the deposition of Higham could be taken with the use of videotape and American procedural rules, CGP takes the position that the video deposition would not be an adequate substitute for live testimony and would hinder CGP's defense. The Court agrees with CGP. "[T]o fix the place of trial at a point where litigants cannot compel personal attendance of witnesses and

may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants." *Gulf Oil,* 330 U.S. at 511, 67 S.Ct. at 844.

In the instant tort and contract case, which turns so critically on the representations of Higham, live testimony is necessary to allow the jury to assess witness demeanor. *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993); *see also Schertenlieb v. Traum,* 589 F.2d 1156, 1159 (2d Cir.1978) (absence of live testimony is "very serious handicap" favoring dismissal); *ACLI Int'l Commodity Servs. v. Banque Populaire Suisse,* 652 F.Supp. 1289, 1296 (S.D.N.Y.1987) (dismissing on forum non conveniens grounds, after concluding that unavailability of key witness and the absence of live testimony outweighed plaintiff's choice of home forum).

The potential use of a videotaped deposition at trial does not alter the Court's reasoning. "The rule in our circuit is clear: a videotape deposition is usually better than a stenographic deposition when the witness cannot appear at trial; however, since demeanor is best judged by live testimony; live testimony is usually better than videotaped testimony." *Windsor Shirt Co. v. New Jersey Nat'l Bank,* 793 F.Supp. 589, 608 (E.D.Pa.1992), *aff'd,* 989 F.2d 490 (3d Cir. 1993). *See also United States v. Ismaili,* 828 F.2d 153, 170 (3d Cir.1987) (Becker, J., concurring), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988); *United States v. Wilson,* 601 F.2d 95, 97 (3d Cir.1979).

A deposition—videotaped or otherwise— simply does not simulate the conditions of trial, where the witness must testify in a courtroom, on the witness stand, before a judge and a jury. These inimitable conditions may mean everything when the "opportunity for the factfinder to appraise the credibility of key witnesses [may make the determinable difference] in this case." *ACLI Int'l,* 652 F.Supp. at 1296.

---

**4.** These potential obstacles to obtaining Higham's deposition also suggest that the access to proof factor may favor adjudication in England. Notwithstanding Kultur's willingness to accept these discovery burdens in order to keep this

litigation in New Jersey, the Court must be sensitive to the effect such burdens may have on the presentation of evidence and Kultur's ability to prove its case.

In view of the Court's inability to compel Higham's appearance as a witness, and his presumed unwillingness to appear as a witness, the Court finds that the private factors of witness availability and access to proof weigh in favor of adjudicating this action in England. Given the determination that Kultur's choice of a New Jersey forum will be accorded no special weight, the Court is satisfied that the *Gulf Oil* private factors weigh in favor of adjudicating this case in England.[5]

### b. Public Factors

#### i. Relative Backlog and Other Administrative Difficulties in the Two Jurisdictions

In addressing CGP's motion to dismiss, the Court may consider relative docket conditions or calendar congestion in the English courts and the District of New Jersey. *Cf. Hernandez v. Graebel Lines,* 761 F.Supp. 983, 991 (E.D.N.Y.1991) (on transfer motion, which also requires consideration of *Gulf Oil* factors, stating that this factor is not decisive but may be given some weight). It appears that an English court will provide for a more expeditious resolution of this case, should it proceed to trial. CGP represents that this case could be resolved in approximately eighteen months in the English courts, where the pleadings phase would take approximately three months, the discovery phase another three months, with a trial to ensue six to nine months later. (Smouha Affidavit ¶ 27) In contrast, litigation in this district, on average, may be resolved before pretrial in 5 months, during or after pretrial in 14 months, or at trial in 23 months. *1992 Annual Report of the Director of the Administrative Office of the United States Courts,* at 172, 174, 208, 210. The Court concludes that this factor favors the English courts.

#### ii. Jurisdictional Interests and Community Burden

Under *Gulf Oil,* the Court must also be aware of the local interests implicated by this lawsuit in the respective jurisdictions or, more specifically, in the respective communities where the litigation and a trial will ensue. *Ricoh Co. v. Honeywell, Inc.,* 817 F.Supp. 473, 486 (D.N.J.1993). Along these same lines, the burden of resolving a legal dispute should not be "imposed upon the people of a community which has no relation to the litigation." *Ferens v. John Deere Co.,* 494 U.S. 516, 529–30, 110 S.Ct. 1274, 1282–83, 108 L.Ed.2d 443 (1990).

Both parties set forth meritorious arguments on the issues of jurisdictional interest and community burden. England certainly has an interest in ensuring that its corporations are not engaged in wrongful business practices or misrepresent their products. Yet this interest does not significantly override New Jersey's interest in providing a forum for its residents who fall victim to the wrongful activities of nonresident corporations entering the state.

Nor can the Court conclude that one jurisdiction has a greater nexus to the events giving rise to this litigation. *See Van Cauwenberghe,* 486 U.S. at 528, 108 S.Ct. at 1953 (in evaluating the interests of each jurisdiction in the dispute, a court must also "consider the locus of the alleged culpable conduct, often a disputed issue, and the connection of that conduct to plaintiff's chosen forum)." Via the wonders of modern telecommunications, CGP's allegedly culpable conduct began in England and ended in New Jersey. The negotiations, the alleged agreement, and any misrepresentation were made by CGP to Kultur through the telephone, telefax or written communications.

Given the locus of the relevant events, and the interest in this case in the respective jurisdictions, the Court concludes that this litigation would not become an onerous burden for either a New Jersey or an English

---

**5.** The parties do not raise any argument that the remaining private factors support their respective positions. Kultur does not contend that litigating this action in England would present obstacles to a fair trial. Nor is there any suggestion that Kultur would be unable to enforce a judgment obtained from an English court. In addition, there appears to be no issue concerning the availability of impleader. In fact, to the extent that Kultur has any right of action against Higham individually, an English court could properly exercise jurisdiction over him. Moreover, CGP's action against Higham is already proceeding in the English courts. To the extent there exist additional factors relating to the expeditious and efficient adjudication of the dispute, the Court will discuss them below when considering the *Gulf Oil* public factors.

community. The public factors of jurisdictional interest and community burden are at equipoise in this case.

### iii. Choice of Law Considerations

An action generally should be tried in a district familiar with the law governing the case. *Gulf Oil,* 330 U.S. at 508–98, 67 S.Ct. at 843. Although choice of law considerations should not be given conclusive or substantial weight, a court should assess "the impact of choice of law problems on the forum, particularly [because] the need to apply foreign law points toward dismissal." *Lacey I,* 862 F.2d at 48.

The Court is not required to determine what law an English court would apply in the instant case. *See Lacey II,* 932 F.2d at 187 n. 14. However, if Kultur's complaint were to proceed here, this Court may be required to apply English law to a majority, or all, of Kultur's claims. Assuming the existence of an agreement here, the record reveals that the parties agreed that disputes in connection with the agreement would be governed by English law. The parties included such a choice of law provision in each of the proposed Heads of Agreement and the proposed License Agreement. (CGP's Brief in Support of Motion to Dismiss, Exhibits 2–5)

In a case where jurisdiction is based upon diversity of citizenship, a district court is required to utilize the choice of law regime of the forum state to determine the applicable substantive law. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Accordingly, the Court turns to New Jersey law in the instant case, and finds that New Jersey courts may honor a contractual choice of law provision as long as the contract bears some reasonable relation to the chosen forum and the forum state's public policy is not violated. *Citibank, N.A. v. Errico,* 251 N.J.Super. 236, 243, 597 A.2d 1091 (App.Div.1991); *Kalman v. Floor Co. v. Joseph L. Muscarelle, Inc.,* 196 N.J.Super. 16, 22, 481 A.2d 553 (App.Div. 1984), *aff'd,* 98 N.J. 266, 486 A.2d 334 (1985). New Jersey has a long standing policy that favors enforcement of forum selection clauses. *Wilfred MacDonald, Inc. v. Cushman, Inc.,* 256 N.J.Super. 58, 63, 606 A.2d 407 (App.Div.1992).

Although this Court is not frequently called upon to construe English law, the prospect of such a task cannot alone warrant dismissal on grounds of forum non conveniens. *Nieminen,* 736 F.Supp. at 587. However, to the extent that the potential applicability of English law may be factored at all, it favors adjudication of this case in England.

Therefore, given (1) the relative administrative burdens and docket conditions in each jurisdiction—and the likelihood that Kultur's claims will be resolved more quickly in England, and (2) the potential applicability of English law to most, if not all, of Kultur's claims, the Court finds that the *Gulf Oil* public factors weigh in favor of adjudicating this action in an English forum.

### CONCLUSION

Kultur has sufficiently established that this Court may properly exercise personal jurisdiction over CGP on the pending claims. Therefore, the Court will deny CGP's motion to dismiss for lack of personal jurisdiction.

On CGP's motion to dismiss for forum non conveniens, the Court has reached the following conclusions. England provides an adequate alternative forum for the resolution of Kultur's claims. Kultur's choice of a New Jersey forum does not deserve significant deference under the circumstances of this case. The balance of *Gulf Oil* private factors weigh in favor of an English forum, especially given the critical need for the live testimony of Higham. The *Gulf Oil* public factors also weigh in favor of an English forum. Therefore, the Court concludes that CGP has satisfied its burden on the pending motion. Kultur's complaint will be dismissed on the ground of forum non conveniens.